# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**ELI WHITE**

     Plaintiff,

v.                               Case No. 8:25-cv-01599-WFJ-AAS

**MISSOURI HIGHER EDUCATION
LOAN AUTHORITY OF THE
STATE OF MISSOURI** d/b/a MOHELA,

     Defendant.

_____/

## ORDER

Before the Court is Defendant Missouri Higher Education Loan Authority's ("MOHELA") Motion for Judgment on the Pleadings pursuant to Fed. R. of Civ. P. 12(c). Dkt. 31. Plaintiff Eli White has responded in opposition, Dkt. 39, and Defendant replied. Dkt. 42. As explained below, Defendant's Motion for Judgment on the Pleadings is denied because MOHELA does not enjoy Eleventh Amendment immunity.

## BACKGROUND

This dispute centers on Plaintiff White's stolen identity and Defendant MOHELA's attempt to collect on the student loans fraudulently opened in Plaintiff's name. Plaintiff's Complaint alleges that on or about February 10, 2023, two student loan accounts owned or serviced by MOHELA were opened in Plaintiff's name

without Plaintiff's consent, knowledge, or approval as a result of identity theft and fraud. Dkt. 1 ¶¶ 37–42. On March 18, 2023, Plaintiff received an alert from Equifax that two new accounts had been opened on his credit reports. *Id.* ¶ 41. On the same day, Plaintiff filed an identity theft affidavit with the Federal Trade Commission, Report Number 157711791. *Id.* ¶ 43.

Beginning in March 2024, Plaintiff was subjected to repeated and persistent debt-collection attempts by MOHELA. *Id.* ¶¶ 44–70. On or about September 19, 2024, Plaintiff attempted to dispute MOHELA's credit reporting of the two accounts with credit reporting agencies (Experian and TransUnion), which forwarded Plaintiff's disputes to MOHELA. *Id.* ¶¶ 81–107. Eventually, Experian and TransUnion deleted their reporting of the two student loan accounts. *Id.* ¶¶ 87, 107.

On June 19, 2025, Plaintiff filed suit against MOHELA alleging that Defendant violated the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b) ("FCRA") and the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. §§ 559.72(7), (9). *See generally id.* Defendant filed an answer to the Complaint on August 12, 2025. Dkt. 23. On October 20, 2025, MOHELA filed the instant Motion for Judgment on the Pleadings. *See* Dkt. 31.

## LEGAL STANDARD

### I.    Rule 12(c)—Judgment on the Pleadings

"Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (citation omitted). "In determining whether a party is entitled to judgment on the pleadings, [the Court] accept[s] as true all material facts alleged in the non-moving party's pleading, and [the Court] view[s] those facts in the light most favorable to the non-moving party. *Id.* (citation omitted). "If a comparison of the averments in the competing pleadings reveals a material dispute of fact, judgment on the pleadings must be denied." *Id.* (citation omitted). Additionally, "judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002) (citation omitted).

### II.    Rule 12(b)(1)—Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction "'empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution,' and which have been entrusted to them by a jurisdictional grant authorized by Congress." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999) (quoting *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994)).

Challenges to subject matter jurisdiction under Rule 12(b)(1) are either "facial"[1] or "factual." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990).

A factual attack "challenge[s] 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" *Id.* at 1529 (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). When the attack is factual, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981)). "A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice." *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).[2]

## DISCUSSION

Based on a careful review of the pleadings, the Court denies Defendant's motion for judgment on the pleadings. As discussed below, Defendant is not an arm of the State of Missouri that is entitled to Eleventh Amendment immunity.

---

[1] A "facial attack" is based solely on the pleadings and requires the court to assess whether the plaintiff has alleged a sufficient basis for subject matter jurisdiction. *Lawrence*, 919 F.2d at 1529.

[2] In this case, Defendant brings a factual attack on subject-matter jurisdiction, contending that MOHELA has sovereign immunity under the Eleventh Amendment. Dkt. 31 at 7 ("This motion presents a factual attack as it does not simply challenge whether Plaintiff's Complaint sufficiently alleges the basis for subject matter jurisdiction, but rather MOHELA asks the Court to consider matters outside the pleadings, including Missouri statutes and an amicus brief.").

## I.    Eleventh Amendment Immunity

The Court begins, as it must, with the text of the Constitution. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Am. XI. The purpose of the Eleventh Amendment is to "shield[] states from suit in federal courts without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 601 (11th Cir. 2014) (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994)). As relevant here, "[a]n entity is protected by a State's Eleventh Amendment immunity if it is an arm of the State." *Monroe v. Fort Valley State Univ.*, 93 F.4th 1269, 1278 (11th Cir. 2024) (citing *Lesinski*, 739 F.3d at 602).

To determine whether an entity is acting as an "arm of the state" when carrying out a particular function, the Eleventh Circuit has outlined four factors for district courts to consider: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003) (en banc) (citations omitted). "[W]hether an entity is an 'arm of the State' for Eleventh Amendment purposes is ultimately a question of

federal law. But the federal question can be answered only after considering provisions of state law." *Id.* The Eleventh Circuit has identified factors (1) "how state law defines the entity" and (4) "who is responsible for judgments against it" as the most important. *Monroe*, 93 F.4th at 1279 (citations omitted). "The entity invoking Eleventh Amendment immunity bears the burden of demonstrating that the *Manders* factors weigh in its favor." *Miller v. Advantage Behav. Health Sys.*, 677 F. App'x 556, 559 (11th Cir. 2017) (citing *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006)).

In this case, MOHELA insists that it is an arm of the State of Missouri, and that the Supreme Court's decision in *Biden v. Nebraska*, 600 U.S. 477, 491 (2023) has already resolved this immunity issue in MOHELA's favor. Dkt. 31 at 2–3. In response, Plaintiff argues that MOHELA is not an arm of the State, and that several federal courts addressing this very issue have found MOHELA does not enjoy sovereign immunity. Dkt. 39 at 3–4. The Court agrees with Plaintiff and finds that MOHELA is not entitled to sovereign immunity.

However, before getting to the *Manders* factor analysis, the Court must determine whether the Supreme Court's opinion in *Biden v. Nebraska* resolves MOHELA's arm-of-the-state status. The Court concludes "that although the Supreme Court's *Biden* opinion is certainly relevant and highlights many of MOHELA's best arguments, it does not resolve the question before" this Court.

6

*Good v. Dep't of Educ.*, 121 F.4th 772, 796 (10th Cir. 2024). Indeed, as the Tenth

Circuit already held, "*Biden* certainly stands for the proposition that there is enough

of a link between MOHELA and Missouri for an injury to the former to constitute

an injury to the latter. But  . . . [the Article III] standing [issue before the Supreme

Court in *Biden*] is an analytically distinct concept from the Eleventh Amendment

question before us here." *Id.* at 797 (citation modified). Because the sole issue here

is Eleventh Amendment immunity (not Article III standing), the Court conducts its

own arm-of-the-state analysis and considers each *Manders* factor in turn. *See Coffey*

*v. Higher Educ. Loan Auth.*, 770 F. Supp. 3d 1332, 1342 (M.D. Fla. 2025) ("Like

the Tenth Circuit, this Court concludes that *Biden* does not resolve the question of

whether MOHELA benefits from Missouri's sovereign immunity. Rather, the Court

must turn to the four factors set forth in *Manders*[.]").

   a.  *How Missouri Law Defines MOHELA*

   The Court begins with the text of the Missouri Higher Education Loan

Authority Act, Mo. Stat. §§ 173.350, *et seq*. (the "Act"). As the Eleventh Circuit

teaches, the way state law defines an entity is crucial in determining its arm-of-the-

state status "because states have extremely wide latitude in determining their forms

of government and how state functions are performed[.]" *Manders*, 338 F.3d at 1309

n.10. A review of Eleventh Circuit caselaw on the first *Manders* factor shows that

courts consider "how the enabling legislation describes the entity, the stated

purposes of the entity, on whose behalf the entity performs its functions, whether the entity is subject to state or local control, how employees of the entity are described, the powers of the entity, and the entity's relationships to other government entities like municipalities and counties." *Coffey*, 770 F. Supp. 3d at 1344–45 (citing *Pellitteri v. Prine*, 776 F.3d 777, 780 (11th Cir. 2015); *Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 769–71 (11th Cir. 2014); *Williams v. Dist. Bd. of Trs. of Edison Cmty. Coll.*, 421 F.3d 1190, 1192–93 (11th Cir. 2005)).

Here, no party disputes that the first *Manders* factor weighs in Defendant's favor, as the Act defines MOHELA as a sovereign instrumentality of Missouri. Dkt. 31 at 11–16; Dkt. 39 at 5–6. The Act expressly states that:

> In order to assure that all eligible postsecondary education students have access to student loans that are guaranteed or insured, or both, and in order to support the efforts of public colleges and universities to create and fund capital projects, and in order to support the Missouri technology corporation's ability to work with colleges and universities in identifying opportunities for commercializing technologies, transferring technologies, and to develop, recruit, and retain entities engaged in innovative technologies, there is hereby created a body politic and corporate to be known as the "Higher Education Loan Authority of the State of Missouri". The authority is hereby constituted a *public instrumentality* and body corporate, and the exercise by the authority of the powers conferred by sections 173.350 to 173.450 shall be deemed to be the *performance of an essential public function*.

Mo. Stat. § 173.360 (emphasis added). Due to MOHELA's classification as "a separate public instrumentality of the state" that is "performing a public function," Missouri has exempted the entity "from all taxation in the state." *Id.* § 173.415.

8

Additionally, the Act's text contains other indicia that MOHELA is akin to a state agency. The Act states that MOHELA is "assigned" to another state agency, the Missouri Department of Higher Education and Workforce Development (the "MDHEWD"). *Id.* § 173.445; *see also id.* § 173.355(6) (defining the "Department" as "the Missouri department of higher education and workforce development"). "The fact that MOHELA is 'assigned' to an executive department by statute is an indicator that, as a matter of state law, it is a state agency." *Good*, 121 F.4th at 800 (citation omitted). The Act also makes clear that each of MOHELA's meetings "for any purpose whatsoever shall be open to the public" and "proceedings and actions . . . shall comply with all statutory requirements respecting the conduct of public business by a public agency." Mo. Stat. § 173.365. Thus, the Court finds that factor one weighs in Defendant's favor. *See Coffey*, 770 F. Supp. 3d at 1344; *Good*, 121 F. 4th at 798–801; *see also Biden*, 600 U.S. at 490 (highlighting many of the same aspects of MOHELA's structure in its enabling act).

### b. What degree of control the State maintains over MOHELA

Next, the Court considers the extent of Missouri's control over MOHELA. Based on the plain text of the Act, the Court finds that factor two weighs against Defendant's favor. Eleventh Circuit caselaw shows that courts should consider things such as the appointment process for entity leadership, the State's oversight over the entity's decision-making, structural limits on the entity's discretion, the

State's training requirements, consequences for failure to comply with the State's requirements, the State's approval of budgets, and whether the entity is subject to local control. *See Williams*, 421 F.3d at 1193–94; *Manders*, 338 F.3d at 1320–22; *Lightfoot*, 771 F.3d at 771–75; *Lesinski*, 739 F.3d at 603–04. In short, this factor "examines where [Missouri] law vests control." *Manders*, 338 F.3d at 1320.

Here, several provisions of the Act indicate that Missouri retains control over MOHELA. As Defendant correctly notes in its motion, Dkt. 31 at 14, MOHELA's seven-member board consists of two state officials and five members appointed by the Governor and approved by the State Senate. Mo. Stat. § 173.360. The other two members of the board are appointed by other means as outlined in the Act. *Id.* And the Governor may remove any member for cause. *Id.* ("Any member of the authority may be removed by the governor for misfeasance, malfeasance, willful neglect of duty, or other cause."); *see also Lesinski*, 739 F.3d at 603 (noting that board members appointed by the Governor of Florida, along with the Governor having removal power, demonstrates state control over the entity in question).

Further, the Act limits MOHELA's ability "[t]o sell or enter into agreements to sell student loan notes" without approval from the MDHEWD, Mo. Stat. § 173.385.1(8), and imposes limitations on how it conduct business, including restricting investments, putting limitations on Stafford loan origination, and requiring distribution to the Lewis and Clark Discovery Fund (the "LCD" Fund). *Id.*

§§ 173.385, 173.387, 173.392. The Act also mandates that MOHELA provide annual financial reports to Missouri department of higher education and workforce development, *id.* § 173.445, seemingly making it "directly answerable" to Missouri. *Biden*, 600 U.S. at 490–91.

However, many of these provisions are undercut by other considerations. Concerning the appointment power by the Governor, "this is not dispositive because 'the power to appoint is not the power to control.'" *Coffey*, 770 F. Supp. 3d at 1344 (quoting *Good*, 121 F.4th at 803). Indeed, MOHELA's board members "serve longer terms than the state officer who appoints them." *Id.* at 1345 (citing Mo. Stat. § 173.360). Once the seven-member board is appointed, its members select an outside individual to serve as the "executive director." Mo. Stat. § 173.370.1. The executive director has the authority to direct and staff MOHELA, not the Governor or MDHEWD. *Id.* § 173.370.2. Further, MOHELA's board—not the Governor— appoints the rest of its leadership, including chairman, vice chairman, secretary, and treasurer. *Id.* § 173.370.1. Along the same vein, the gubernatorial and legislative control is limited, as "the Act does not give the Governor any power to veto or block actions taken by MOHELA." *Good*, 121 F.4th at 804 (citing Mo. Stat. §§ 173.350– 173.445); *Pellegrino v. Equifax Info. Servs., LLC*, 709 F. Supp. 3d 206, 217 (E.D. Va. 2024) ("[T]he State of Missouri has no veto power over MOHELA's regular activities.").

11

As to the annual financial reporting requirement, Mo. Stat. § 173.445, this is not dispositive or compelling as annual reporting, without more, "is primarily a ministerial requirement that does not demonstrate actual control by the State." *Coffey*, 770 F. Supp. 3d at 1345. Nor do the required distributions to the LCD Fund move the needle, as these distributions only become "state funds" if the Missouri legislature elects to use the money for the designated educational purposes listed in the Act. Mo. Stat. § 173.392.

Importantly, several other statutory provisions reflect MOHELA's significant operational independence from the State. As another court in the Middle District found, "MOHELA can independently engage in all manner of ordinary business-like activities without Missouri's control or supervision." *Coffey*, 770 F. Supp. 3d at 1345. For example, MOHELA has the autonomy to, among other things, "adopt bylaws for the regulation of its affairs and the conduct of its business," "[t]o sue and be sued and to prosecute and defend" lawsuits, "[t]o issue bonds or other forms of indebtedness to obtain funds to purchase student loan notes or finance student loans," "[t]o make and execute contracts," "to enter into agreements or other transactions with any federal or state agency, any person and any domestic or foreign partnership, corporation, association or organization," and "[t]o service student loans for any owner thereof, regardless of whether such student loans are originated in [Missouri] or out of this state." Mo. Stat. § 173.385.1(2), (3), (6), (11), (15), (18).

Like a private corporation, it also has the power "[t]o have and to use a corporate seal," "[t]o acquire, hold and dispose of personal property," and "[t]o collect reasonable fees and charges" for its services. *Id.* § 173.385.1(4), (12), (14).

In sum, "MOHELA has significant independent authority to engage in business dealings without prior approval or subsequent veto power by the State." *Walker v. Higher Educ. Loan Auth. of the State of Mo.*, No. 1:21-CV-00879-KES-SAB, 2024 WL 3568576, at *7 (E.D. Cal. July 26, 2024) (citing Mo. Stat. §§ 173.385, 173.445). Indeed, with this vast authority, MOHELA has been able to independently contract with the federal government to service "nearly $150 billion worth of federal loans, having been hired by the Department of Education to collect payments and provide customer service to borrowers." *Biden*, 600 U.S. at 489. As such, any minor degree of gubernatorial and legislative control over MOHELA is undercut by all the other independent powers that make MOHELA look "like a private nonprofit or municipality [rather] than a state agency." *Coffey*, 770 F. Supp. 3d at 1345; *see Good*, 121 F.4th at 804. Therefore, the second *Manders* factor weighs against a finding of sovereign immunity.

### c. *Where MOHELA derives its funds*

Factor three weighs in favor of finding that MOHELA is not an arm of the State for similar reasons discussed in factor two. Eleventh Circuit authority, in evaluating this factor, considers several things, including whether the State controls

the entity's budget, whether the entity has the power to tax, whether the State's approval is required before issuing bonds, and whether the entity generates its own revenue. *See, e.g.*, *Williams*, 421 F.3d at 1193; *Manders*, 338 F.3d at 1323–24; *Lesinski*, 739 F.3d at 604–05. When considering this factor, the Court must also exercise particular care in evaluating state law in relation to the function at issue. *See Manders*, 338 F.3d at 1323 (considering whether "state funds are involved . . . in the particular functions of [the entity] at issue").

Here, multiple provisions of the Act strongly indicate that MOHELA's funding is not derived from any State funds since MOHELA receives no direct financial assistance from the State, generates its own revenue without State oversight, and can issue bonds to carry out its duties with few limitations. Beginning with the lack of financial assistance and independent revenue streams, the Act expressly states that MOHELA's expenses "shall be payable solely from funds provided" by the performance of its services. Mo. Stat. § 173.420. And while MOHELA is authorized "[t]o accept appropriations, gifts, grants, bequests, and devises," *id.* § 173.385.1(10), the Act contemplates—and Defendant concedes—that MOHELA is sustained primarily by the revenue it generates through its business operations. *See id.* § 173.385.1(8), (12), (13), (14) (granting MOHELA the power to sell the student loans it has acquired, collect reasonable fees and charges for its services, invest its funds, and acquire/dispose of personal property); Dkt. 31 at 20

(admitting "MOHELA does not receive funds directly from the State," but instead earns fees for servicing loans on behalf of the federal government and other private lenders). These fees and charges Defendant generates "shall be used to pay the costs of the authority." Mo. Stat. § 173.385.1(12). Nothing in the Act indicates that these revenue-generating powers are subject to executive oversight or legislative review.

Nor are MOHELA's revenues as assets considered to be public funds. *See id.* § 173.425 (stating that "[n]o asset of [MOHELA] shall be considered to be part of the revenue of the state . . . and no asset of [MOHELA] shall be required to be deposited into the state treasury, and no asset of [MOHELA] shall be subject to appropriation by the general assembly," except for the distributions to the LCD Fund, and "[s]tudent loan notes purchased or financed shall not be considered to be public property").

As to the power to issue bonds, the Tenth Circuit in *Good* conducted an exhaustive analysis of the Act's bond provisions, concluding that while there might be some limitations, MOHELA has "broad authority" to issue bonds and "a great deal of discretion in setting the terms of the bonds it issues[,] [including] . . . set[ting] the interest rate, the form and denomination, and when and where the bonds must be paid." 121 F.4th at 810; *see* Mo. Stat. §§ 173.385.1(6)–(7), (16)–(17), 173.390, 173.405. Further, the appellate court found that MOHELA's authority to issue bonds is not subject to State review or procedures, "at least not to any meaningful degree."

*Good*, 121 F.4th at 811. Indeed, the provision requiring MOHELA to report annually its bond revenues is not a substantial constraint on its authority to issue bonds. *See* Mo. Stat. § 173.445.

Notably, MOHELA's ability to generate revenue through bond sales is independent of the State, as the Act dedicates an entire subsection to emphasize that any bond issued by MOHELA is its sole responsibility and not backed by the full faith and credit of Missouri. *See id.* § 173.410 ("Bonds or other forms of indebtedness . . . shall not be deemed to constitute a debt or liability of the state or of any political subdivision thereof or a pledge of the full faith and credit of the state or of any such political subdivision . . . . Nothing in this section shall be construed to authorize [MOHELA] to create a debt of the state within the meaning of the constitution or statutes of the state of Missouri, and each bond or other form of indebtedness issued by [MOHELA] shall be payable and shall state on its face that it is payable solely from the funds pledged for its payment in accordance with the bond resolution authorizing its issuance. The state shall not be liable in any event for the payment of the principal of or interest on any bonds of [MOHELA] or for the performance of any pledge, mortgage, obligation, or agreement of any kind whatsoever which may be undertaken by the authority."); *id.* § 173.385.1(6) ("Such bonds or other forms of indebtedness shall not constitute a debt or liability of the state of Missouri or of any political subdivision thereof.").

When considering all these financial-structure provisions together, "it is clear that MOHELA was intended to be a self-sufficient enterprise" that is not dependent on state appropriations. *Good*, 121 F.4th at 812. Defendant, however, argues that the inability to levy taxes and the statutory requirement that MDHEWD approve the sale of student loans weigh in favor of finding it is an arm of the State. Dkt. 31 at 19–20 (citing Mo. Stat. § 173.385.1(8)). The Court disagrees. While Defendant's motion seems to suggest that MDHEWD must approve *all* student loan notes being sold, the text of the Act plainly states that MDHEWD approval is only required for the sale of student loan notes that Missouri guarantees. *See* Mo. Stat. § 173.385.1(8) (noting that only "student loan notes guaranteed under section 173.110 shall be subject to prior approval of the [MDHEWD]"); *Good*, 121 F.4th at 811; *see also Dykes v. Mo. Higher Educ. Loan Auth.*, No. 4:21-CV-00083-RWS,  2021 WL 3206691, at *3 (E.D. Mo. July 29, 2021) (noting that only "certain" student loan sales are subject to MDHEWD approval). Thus, the Court finds that the third *Manders* factor weighs against finding MOHELA is an arm of the State.

### d. Who is responsible for judgments against MOHELA

Finally, the fourth factor considers whether "the action is in essence one for the recovery of money from the state." *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). If so, "the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit." *Id.* This factor weighs in favor of

applying sovereign immunity when "the state's treasury is directly implicated." *Lesinski*, 739 F.3d at 605 (alterations adopted). However, "[n]ever has the Supreme Court required an actual drain on the state treasury as a per se condition of Eleventh Amendment immunity." *Manders*, 338 F.3d at 1327. "A direct drain on the state treasury is not a prerequisite; functional liability can be sufficient to satisfy this factor." *Coffey*, 770 F. Supp. 3d at 1346 (citing *Manders*, 338 F.3d at 1324–27).

Here, Defendant's motion lists a parade of horribles that may occur if a substantial (hypothetical) judgment were issued against MOHELA. Dkt. 31 at 22–24. Specifically, MOHELA argues that it may be unable to contribute to Missouri colleges and universities, scholarships for Missouri students, the Access Missouri Financial Assistance Fund, and the LCD Fund. *Id.* But Defendant's own enabling statute repeatedly states—across multiple provisions—that any judgment would be against MOHELA, not the State treasury. As discussed above, Missouri bears no legal liability for the bonds issued by MOHELA, and MOHELA is not authorized to create any debt for which Missouri would be responsible. *See* Mo. Stat. §§ 173.410, 173.385.1(6). The Act also "carefully and repeatedly specifies that both MOHELA's assets and its liabilities are its own." *Coffey*, 770 F. Supp. 3d at 1346 (citing Mo. Stat. §§ 173.405, 173.410, 173.420); *see also* Mo. Stat. § 173.425 ("No asset of the authority shall be considered to be part of the revenue of the state . . . , and no asset of the authority shall be required to be deposited into the state treasury, and no asset

18

of the authority shall be subject to appropriation by the general assembly, except for those amounts distributed by the authority to the [LCD] fund . . . . The assets of the authority shall remain under the exclusive control and management of [MOHELA].").

Concerning the possibility that MOHELA would be unable to fulfil its statutory obligations to contribute $350 million to the LCD Fund, *see* Mo. Stat. § 173.392, several federal district courts have already rejected this argument.[3] As another district court explained:

> It is true, as MOHELA argues, that a judgment against MOHELA could impact its ability to provide the remainder of the funds to the LCD Fund; however, given the LCD Fund's narrow purpose, MOHELA's obligation to the State is limited. Moreover, the statute creating the LCD Fund provides a mechanism for delaying payments if making such payments would "materially adversely affect the services and benefits provided" or "the economic viability of the authority." RSMo. § 173.385.2. Accordingly, even if a judgment against MOHELA resulted in a delay in its contribution to the LCD Fund, that delay would not impact the general revenue of the State because "moneys in the [LCD Fund] shall not revert to the credit of the general revenue fund," RSMo. § 173.392, and the State of Missouri is not required by statute to fund MOHELA's share.

*Pellegrino*, 709 F. Supp. 3d at 214.

---

[3] *See Coffey*, 770 F. Supp. 3d at 1345–46; *Pellegrino*, 709 F. Supp. 3d at 214; *Dykes*, 2021 WL 3206691, at *4; *Perkins v. Equifax Info. Servs., LLC*, No. SA19CA1281FBHJB, 2020 WL 13120600, at *4 (W.D. Tex. May 1, 2020); *Am. Fed'n of Tchrs. v. Higher Educ. Loan Auth. of the State of Mo.*, No. 24-CV-2460 (TSC), 2025 WL 2779802, at *12 (D.D.C. Sept. 29, 2025); *Walker*, 2024 WL 3568576, at *8; *Maldonado v. Higher Educ. Loan Auth. of the State of Mo.*, No. 24-CV-07850-VC, 2025 WL 1085105, at *1 (N.D. Cal. Apr. 9, 2025); *but see Gowens v. Capella Univ., Inc.*, No. 4:19-CV-362-CLM, 2020 WL 10180669, at *4 (N.D. Ala. June 1, 2020) (holding MOHELA is an arm of the State).

And while the record is unclear about how much MOHELA has paid towards the $350 million LCD Fund requirement, at least one district court in 2021 noted that "MOHELA has [already] provided the bulk of funding required by the statute" and that "[w]hile a judgment against MOHELA could impact its ability to provide the remainder of the funds to the [LCD] Fund, this does not make the State functionally liable for any judgments against MOHELA. MOHELA's total obligation to the state is limited." *Dykes*, 2021 WL 3206691, at *4. Indeed, there appears to be statutory support for the conclusion that Defendant's obligation to provide funds to the LCD Fund ended in September 2013. *See* Mo. Stat. § 173.385.2 ("[T]he distribution of the entire three hundred fifty million dollars of assets by the authority to the Lewis and Clark discovery fund shall be completed no later than September 30, 2013."); *Perkins v. Equifax Info. Servs., LLC*, No. SA19CA1281FBHJB, 2020 WL 13120600, at *4 (W.D. Tex. May 1, 2020) (citation omitted) ("This argument [about the LCD Fund] may have had force some years ago, but not anymore. . . . MOHELA's obligation to transfer assets to the Fund expired in September 2013. While MOHELA is still permitted to transfer assets to the Fund under § 173.185.1(9), it is no longer under any obligation to do so.").

Regardless, assuming a hypothetical judgment is issued against MOHELA, assuming MOHELA still has not distributed the full $350 million to the LCD fund, and assuming said judgment actually inhibits its ability to contribute to the LCD

20

Fund, Defendant elides the fact that the Act provides a mechanism for delaying payments if making such payments would materially adversely affect the services and benefits provided or the economic viability of the authority. *See* Mo. Stat. § 173.385.2. Defendant previously invoked this mechanism during the 2008 recession. *See Dykes*, 2021 WL 3206691, at *4. As such, in the event of any adverse judgment against MOHELA, it could invoke statutory protections to delay payment to the LCD Fund.

More fundamentally, MOHELA's argument misses the mark, as any delay in payment to the LCD Fund would not impact the State's general revenue or the State's treasury. The LCD Fund has a limited purpose to fund projects at public state institutions and to support the Missouri Technology Corporation's ability to work with state institutions to advance innovative technologies. *See* Mo. Stat. § 173.392.2. The LCD Fund cannot be used as part of the State's general revenue. *Id.* § 173.392.1. Similarly, with respect to the other scholarships and financial assistance funds Defendant identifies, none of those contributions is statutorily required, and Defendant provides no citation to the Act suggesting otherwise. *See* Dkt. 31 at 22. While MOHELA's contributions may have saved the State legislature money, they have no bearing on whether the State would be functionally liable for a judgment against MOHELA. *See Dykes*, 2021 WL 3206691, at *4; *Pellegrino*, 709 F. Supp. 3d at 214.

At bottom, the Court cannot conclude that MOHELA is "so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries." *Hess*, 513 U.S. at 50 (quoting *Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218, 227 (D.C. Cir. 1986)). As discussed above, the text of the Act reveals that MOHELA is a self-sufficient enterprise, and there is no requirement to apply Eleventh Amendment immunity "where the agency is structured . . . to be self-sustaining." *Id.* (citation omitted). Therefore, the Court finds the fourth *Manders* factor weighs against a finding that MOHELA is an arm of the State.[4]

## CONCLUSION

The Court concludes that only the first *Manders* factor weighs in favor of finding that MOHELA is entitled to sovereign immunity for its debt-collection and credit-reporting activities. On balance, because three factors weigh against applying sovereign immunity, MOHELA has not met its burden to establish that it shares in Missouri's sovereign immunity. Thus, for the purposes of resolving this motion for

---

[4] Defendant asks this Court to rely on Missouri's amicus brief filed in a pending petition for certiorari, No. 24-992 (U.S.), arising out of the Tenth Circuit Court of Appeals' decision in *Good*, 121 F.4th 772. Dkt. 31 at 13; Dkt. 42 at 4; Dkt. 31-1 (showing amicus brief). Defendant cites to the separation-of-powers discussion in the amicus brief, arguing that the separation of power provisions in Missouri's Constitution "necessitated the creation of an entity structured like MOHELA." Dkt. 42 at 4 n.2 (citing Dkt. 31-1 at 7–8). Defendant emphasizes that "by putting MOHELA under the 'supervision and control' of the executive branch, *Biden*, 600 U.S., at 490, the legislature ensured that the State could still direct MOHELA's actions." *Id.* (citing Dkt. 31-1 at 8). Yet, the Court's extensive examination of the Act throughout this Order—which is notably absent from the section of the amicus brief Defendant cites—reveals that any supposed "supervision and control" by the executive branch is tenuous and inconsequential when parsing the text of MOHELA's enabling statute.

judgment on the pleadings, the Court holds that MOHELA is not entitled to Eleventh Amendment immunity.[5]

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that Defendant MOHELA's Motion for Judgment on the Pleadings, Dkt. 31, is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, on January 5, 2026.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record

---

[5] Defendant's motion also argued that it was immune from suit because it enjoys sovereign immunity under Missouri law. Dkt. 31 at 24. However, the Court declines to address this issue since Defendant "withdraw[s] this second argument presented in MOHELA's motion at this time without waiver of MOHELA's ability to address it later in this case." Dkt. 42 at 8.